J-A23042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO A.S.M., A MINOR | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.S.J., MOTHER | : : : : : | |
| | : | No. 676 MDA 2022 |

Appeal from the Order Entered April 4, 2022
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2022-00163

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO N.S.M., A MINOR | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.S.J., MOTHER | : : : : | |
| | : | No. 677 MDA 2022 |

Appeal from the Order Entered April 4, 2022
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2022-00164

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO N.M.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.S.J., MOTHER | : : : : | |
| | : | No. 678 MDA 2022 |

Appeal from the Order Entered April 4, 2022
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2022-00165

J-A23042-22

BEFORE:   BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED OCTOBER 13, 2022**

L.S.J.  ("Mother") appeals from the April 4, 2022, orders entered in the Court of Common Pleas of Lebanon County, which involuntarily terminated Mother's parental rights to her children: A.S.M., N.S.M., and N.M.M. (collectively "Minor Children").[1]  After a careful review, we affirm.

The relevant facts and procedural history have been set forth, in part, by the Orphans' Court as follows:

> A.S.M. is an eight-year-old female minor child who was born [in] November [of] 2013.  N.S.M. and N.M.M. are ten-year-old female minor children who were born [in] April [of] 2012, as twins. N.M.M. is the older twin.
>
> Mother is the natural mother of A.S.M., N.S.M., and N.M.M. Mother was born [in] December [of] 1985, is thirty-five years old, and is an adult individual.  J.G.M., Jr. ("Father") is the natural father of Minor Children.  Father was born [in] July [of] 1983, is thirty-eight years old, and is an adult individual.  Mother and Father have never been married to each other, but Father married another woman.
>
> Minor Children were living with Mother before she was incarcerated and evicted on November 4, 2019.  Lebanon County Children and Youth Services ("Agency") was granted emergency custody because Mother was incarcerated, and Minor Children did not have adult supervision.  Notably, Minor Children have been in the legal and physical custody of the Agency from November 4, 2019, until the present.  The shelter care hearing was held on November 6, 2019, and the dependency petition was filed on November 19, 2019, [for all three children].  On December 9,

_____

* Former Justice specially assigned to the Superior Court.

[1] The parental rights of J.G.M., Jr. ("Father") were also terminated as to Minor Children.  Father is neither a party to this appeal nor has he filed his own appeal.

- 2 -

2019, an adjudication hearing was held for Minor Children, and [they] were found to be dependent children because they were without proper parental care or control under 42 Pa.C.S.A. [§] 6302(1) and were without a parent, guardian, or other custodian under 42 Pa.C.S.A. [§] 6302(4), and, thus, legal custody and physical custody of Minor Children was granted to the Agency.

Dependency review hearings were held for Minor Children on July 21, 2020, February 16, 2021, and August 17, 2021. Mother and Father were informed about their respective goals, tasks, and what they needed to do. Mother and Father were also informed that the Agency had resources to assist them if they needed help with the completion of their goals. As some examples, the Agency offered to help with a mental health evaluation with Dr. Martha, the Agency gave Mother a food voucher, the Agency provided Mother with parenting education services, and the Agency helped Mother with finding appropriate housing. However, Minor Children [have] remained in the custody of the Agency since November 4, 2019, because Mother and Father failed to complete their goals. On February 18, 2022, the Agency filed three Petitions for Involuntary Termination of Parental Rights under 23 Pa.C.S.A. [§] 2511(a)(1), (2), (5), and (8). [The trial court appointed separate legal counsel to represent Mother and Father. Further, finding the dual role did not pose a conflict, the trial court appointed Minor Children's guardian *ad litem*, Matthew Karinch, Esquire, to serve as Minor Children's legal counsel]. [T]he hearing on the matter was held on April 4, 2022.[2]

***

[At the hearing, it was established that] Mother had thirteen goals since the start of these cases:

(1)    Maintain stable housing for a minimum of six months;

(2)    Maintain the home to keep it free of safety concerns regarding the children;

(3)    Inform the Agency of any changes in home conditions within twenty-four hours of such changes;

_____

[2] During the hearing, Attorney Karinch argued it would be in Minor Children's best interests and legal interests for Mother's parental rights to be terminated so that Minor Children may be adopted by the foster parents.

(4)  Obtain and maintain a stable source of income for a minimum of six months;

(5)  Inform the Agency of any changes in employment, employment status, or income within twenty-four hours of such change;

(6)  Attend, participate in, and successfully complete an age appropriate and Agency approved parenting course;

(7)  Demonstrate the skills learned from the parenting class provider;

(8)  Complete a mental health evaluation from the Agency approved provider and follow all recommendations;

(9)  Complete a drug and alcohol evaluation from an Agency approved provider and follow all recommendations;

(10)  Inform the Agency of any changes in address or phone number within twenty-four hours of such change;

(11)  Sign all necessary releases of information as needed;

(12)  Follow all of the Agency's recommendations; and

(13)  Pay child support as ordered by Domestic Relations.

The Agency's overall main concerns for Mother were that she would not be able to control her behavior, have stable housing, and have stable income.

Mother satisfied a number of her goals; some were completed along the way, and some were completed shortly before the Petitions for Involuntary Termination of Parental Rights were filed. Mother did inform the Agency when there were changes in her living and job situations. Mother completed a parenting class in 2017, she completed another parenting class in September of 2020, and she started a new one [just prior to the termination hearing]. Mother did undergo a mental health evaluation and provided it to the Agency on February 14, 2022. However, this was a goal from day one, and Minor Children were in placement for over 27 months by that point, which did not

provide much time to implement its findings. Mother also completed a drug and alcohol evaluation, and the results of the test were negative. However, Mother never submitted to a drug test for a more specific drug, K2, when requested to do so[.] Similarly, Mother's significant other did complete a drug test before this review period, and the results of the test were negative, but he would not submit to a more recent drug test. Mother let the Agency know of phone number and address changes, and Mother signed all necessary releases of information as needed by the Agency.

However, Mother was never able to accomplish several of her main goals, which included having a stable home, having stable employment, and demonstrating parenting skills. While Mother had enough housing and employment to support herself, Mother never had enough to support Minor Children. After Minor Children were taken into the Agency's custody, Mother lived in a single room with a stove right against the bed and she shared a common bathroom. This room was too small, and the common bathroom was a concern to the Agency. On June 10, 2021, Mother bought a car with tax return money from January of 2021 rather than securing appropriate housing with the money as recommended by the Agency. However, Mother was then able to more easily look for housing or jobs out of the county with that car.

In approximately late January or early February of 2022, Mother improved her housing by moving into the home of Gary McGarvey. Mother and Gary McGarvey are friends who met about one year ago through a mutual friend. Gary McGarvey is currently permitting Mother to live in his home because he needs assistance to address his stroke-related health issues and because he is not getting better. Mother has some experience working in the medical field. Currently, in return for her assistance, Mother sometimes receives small payments but is primarily compensated by being able to live in Gary McGarvey's home rent-free. However, Mother's housing arrangement with Gary McGarvey is not secured by a lease; instead, the two only have a verbal agreement. Gary McGarvey stated during his testimony that he is willing to sign a lease with Mother and that he is willing to let Minor Children move in [with Mother]. Gary McGarvey has met Minor Children about three times, and he has lived with young children about ten years ago. Minor Children would get the back bedroom. Mother has a room in the home at this time. Besides when using the bathroom, Gary McGarvey stays and sleeps in the living room without a

bed[.] While the caseworker for the Agency stated that Mother's housing arrangement with Gary McGarvey could be appropriate if there was a signed lease that would give stability, the caseworker was also concerned about whether the possible Social Security and/or Medicaid money would be paid to Mother, about the bathroom location in the house layout, and about the possibility of Gary McGarvey being able to and wanting to sleep in a bed again.

Mother used to work for General Mills, but she was hurt by a fire that burnt her left hand sometime in 2018. General Mills suggested that Mother apply for Social Security Disability. Mother was eligible for Social Security Disability, and she applied for it in 2021, but Mother had not been approved by the time of the April 4, 2022, hearing. Partly due to the hand injury, which made working difficult, Mother has not worked consistently. However, Mother also would not work sometimes because of her own bias. Mother did consider working at Hershey, but Mother said she could not work there because the people she would work with only spoke Spanish. In approximately late January or early February of 2022, Mother started the work arrangement with Gary McGarvey. Currently, in return for her assistance, Mother sometimes receives small payments but is primarily compensated with lodging. Mother is also trying to gain compensation from Social Security and/or Medicaid for assisting Gary McGarvey. Mother's application was submitted about two months prior to the April 4, 2022, hearing and was pending at that time. The application review is estimated to take about forty-five to one hundred and fifty days to complete. Within the week prior to the April 4, 2022, hearing, Mother started a job as a forklift operator at Samsung in Bethel, Pennsylvania. Her shifts are from 11:00 P.M. until 7:00 A.M. Sunday through Thursday. Mother earns a wage of $18.00 an hour but may receive a wage of $19.75 an hour and benefits after a certain period of time. Notably, on January 23, 2022, Mother was cited for driving without a license. Despite Gary McGarvey needing a wheelchair, Mother explained that he is able to drive Mother around when necessary, and Mother planned to regain her license soon.

Mother did not demonstrate satisfactory parenting skills because Mother often was unable to control her emotions enough to administer appropriate discipline. Mother has hit Minor Children with belts and wires, and Minor Children do not want to go back to Mother. Mother does have child endangerment charges for hitting Minor Children. Minor Children said that they are afraid of

- 6 -

Mother who is mean and lies to them. Minor Children are anxious before and after visits with Mother, and Minor Children act differently on visitation days. Minor Children are all afraid before Mother's visits because they are worried Mother will hurt them, and they do not want to go back to live with her. N.M.M. and N.S.M. both make visits to the school nurse for headaches and stomachaches near visitation times with Mother. Minor Children have pleaded to not go to visits, and they try to avoid getting into a car for visits with Mother. Sometimes, Minor Children had tears streaming down their faces and their bodies would be shaking when [they were] told they needed to go to a visit [with Mother].

There are multiple recent incidents establishing that Minor Children are distressed by Mother such as when Mother became escalated and screamed at a caseworker because the caseworker was too close to her; Mother left this visit within ten minutes, and Minor Children were left with feelings of anxiety and uncertainty. In another incident, Mother was upset with a caseworker about how the girls should use the bathroom during a supervised visit in the Courthouse in January of 2022. During this visit, Mother screamed and pushed the caseworker, which left Minor Children so scared that they were curl[ed] up into a ball and crying hysterically underneath the table. Also, in January of 2022, Mother scared Minor Children when Mother put them into her car without any car booster seats or proper restraints because Minor Children knew that the situation was unsafe. During a different visit, Mother grabbed N.S.M.'s arm and threw N.S.M. into a corner. Minor Children are afraid of Mother.

Mother also did not demonstrate satisfactory parenting skills because Mother was not involved enough in helping with Minor Children's education, and Mother was not asking about or helping Minor Children with general needs[.] Mother was informed about school and medical appointments, and Mother did attend some appointments but did not ask about Minor Children's school or medicine enough. A.S.M. and N.M.M. have ADHD and N.S.M. has Turner Syndrome, but Mother has not been invested in helping with the medical care of Minor Children. Mother also did not contact or ask Amanda Bressler, the foster mother, about more general topics regarding Minor Children, such as their well-being, softball, or Girl Scouts. Mother would not help Minor Children with their homework during her time and because her visits were not long enough. Similarly, Mother at one point assisted Minor Children with their hair during visits but stopped because she did

not want to help with their hair during her time and because her visits were not long enough.

Additionally, Mother did not demonstrate satisfactory parenting skills because her visits were often inappropriate and, because of her conduct, fluctuated between supervised and unsupervised visits. For instance, during one visit, one of Minor Children climbed into a car and was almost able to start the car so the Agency decided to switch to supervised visitation. In August of 2021, Mother's visitation also returned to being supervised because Mother failed to follow the Agency's recommendations when she permitted Father to attend her unsupervised visits without the Agency's approval even though Father was only permitted supervised visits. After a complex case review in November 2021, the Agency authorized Mother to act as a supervising party if she is allowed unsupervised visitation and if Father wanted to visit Minor Children during Mother's visits. Mother's visitation has not always been consistent. Mother cancelled five of her thirteen visits since January of 2022.

Mother did not follow all of the Agency's recommendations. On June 10, 2021, Mother bought a car with tax return money rather than securing appropriate housing with the money as recommended by the Agency. In August of 2021, Mother's visitation also returned to being supervised because Mother failed to follow the Agency's recommendations when she permitted Father to attend her visits without the Agency's approval. Mother failed to follow the Agency's recommendation that Minor Children need to be in car seats. Mother never submitted to a drug test for a more specific drug, K2, when requested to do so recently. Similarly, Mother's significant other did complete a drug test before this review period, and the results of the test were negative, but he would not submit to a more recent drug test. Mother would not share information about her significant other such as where he works, if he will live with her, how involved he will be, and what day-to-day life would be like despite Mother being asked to do so by the Agency since the significant other would be part of the return home plan. The Agency also wanted to know this information because the significant other attends both supervised and unsupervised visits. Additionally, the Agency wanted to know this information because Mother was previously concerned about possible sexual abuse by someone else Mother knew and stayed with before, even though the police report she made was deemed unfounded by the Agency.

Lastly, Mother was in arrears of her child support obligation…[S]he had accrued an arrearage of $5,415.70 as of January 19, 2022[.]

While Mother did bring gifts, clothing, and some food to every visit, and Mother does make birthdays and Christmas special for Minor Children, Mother has not performed her parental duties in the last six months and has appeared more as a friend to Minor Children. Mother did not become emotionally invested enough to get to know Minor Children and their interests. Recently, Mother wanted to start family counseling, but 29 months had already passed by the April 4, 2022, hearing. While Minor Children do have a bond with Mother, Mother has not enjoyed a consistent place of importance in Minor Children's lives, and the caseworker testified she believes that Minor Children would adjust if the relationship is severed. Minor Children all want permanency. However, Minor Children do not want to go back to Mother.

In contrast, [the needs and] the welfare of Minor Children are being addressed better by Amanda Bressler. Minor Children have been doing amazing in foster placement for the last eight months and are well-adjusted away from Mother. Minor Children are improving academically. Minor Children are engaging in many extracurricular activities, they have friends, and A.S.M. "has come out of her shell." Amanda Bressler stated that Minor Children also enjoy many activities such as having family game nights, having movie nights, going to the playground, doing arts and crafts together, and helping with cooking and baking food. With supervision, Minor Children are now able to make French toast, gelatin, grilled cheese, and cake. Minor Children are also receiving appropriate medical care in foster placement and anything involving an individualized education plan ("IEP") is handled when needed. Amanda Bressler provides stability, is an adoptive resource, and Minor Children want to be adopted by her. Minor Children have a close relationship with Amanda Bressler. Minor Children go to her, hug her, sit on her lap, and they call Amanda Bressler "Mom" and "Mommy."

Orphans' Court Opinion, filed 6/2/22, at 3-13 (citations to record omitted) (footnote added).

By orders entered on April 4, 2022, the Orphans' Court held that termination of Mother's parental rights was proper under Subsections 2511(a)(1), (2), (5), (8), and (b).

With the assistance of counsel, Mother filed three separate timely notices of appeal, as well as a contemporaneous Pa.R.A.P. 1925(b) statement. On June 2, 2022, the Orphans' Court filed a Pa.R.A.P. 1925(a) opinion, and on appeal, this Court *sua sponte* consolidated Mother's appeals.

On appeal, Mother sets forth the following issue in her "Statement of Questions Presented" (verbatim):

> A.    Whether the trial court erred when it entered an Order on April 4, 2022, terminating Mother's parental rights, especially in light of the competent evidence regarding the Children being bonded with her and the progress on many of her assigned goals?

Mother's Brief at 7 (unnecessary capitalization and suggested answer omitted).

On appeal, Mother avers the Agency did not provide clear and convincing evidence in support of termination under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) or in support of finding that termination would be in Minor Children's best interests under 23 Pa.C.S.A. § 2511(b). Specifically, as to Subsection 2511(a), she contends the evidence reveals she made progress on many of her assigned goals such that termination was unwarranted. As to Subsection 2511(b), she contends the evidence reveals she was bonded with Minor Children such that termination was not in their best interests.

- 10 -

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013).

"The [orphans'] court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the [orphans'] court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Subsection 2511, the court must engage in a bifurcated process prior to terminating

- 11 -

parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Subsection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Subsection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation omitted).

In the case *sub judice*, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a), as well as Subsection 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination orders pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the

- 12 -

incapacity, abuse, neglect or refusal cannot or will not
be remedied by the parent.

. . .

**(b) Other considerations.--**The court in terminating the rights
of a parent shall give primary consideration to the developmental,
physical and emotional needs and welfare of the child.  The rights
of a parent shall not be terminated solely on the basis of
environmental factors such as inadequate housing, furnishings,
income, clothing and medical care if found to be beyond the
control of the parent.  With respect to any petition filed pursuant
to Subsection (a)(1), (6) or (8), the court shall not consider any
efforts by the parent to remedy the conditions described therein
which are first initiated subsequent to the giving of notice of the
filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b) (bold in original).

With regard to termination of parental rights pursuant to Subsection

2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23
Pa.C.S.A. § 2511(a)(2), the following three elements must be
met:  (1) repeated and continued incapacity, abuse, neglect or
refusal; (2) such incapacity, abuse, neglect or refusal has caused
the child to be without essential parental care, control or
subsistence necessary for [her] physical or mental well-being; and
(3) the causes of the incapacity, abuse, neglect or refusal cannot
or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation

omitted).  "The grounds for termination due to parental incapacity that cannot

be remedied are not limited to affirmative misconduct.   To the contrary, those

grounds may include acts of refusal as well as incapacity to perform parental

duties."  *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015)

(quotation omitted).  Parents are required to make diligent efforts towards the

reasonably prompt assumption of full parental responsibilities.  *See id.*

- 13 -

Instantly, in finding grounds for termination of Mother's parental rights, including pursuant to Subsection 2511(a)(2), the Orphans' Court reasoned:

> Minor Children have been removed from the care of Mother by [the Orphans'] Court because Minor Children were found to be dependent children as they were without proper parental care or control under 42 Pa.C.S.A. [§] 6302(1) and were without a parent, guardian, or other custodian under 42 Pa.C.S.A. [§] 6302(4) so legal and physical custody of Minor Children was granted to the Agency. Mother did not sufficiently improve this situation for a period of 29 months by the time of the April 4, 2022, [termination] hearing.

> Mother's conduct of refusing or failing to perform parental duties, Mother's incapacity, abuse, neglect, or refusal, which has caused Minor Children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being, and the conditions which led to removal or placement continue to exist because of the following reasons. As established more thoroughly above, while Mother had enough housing and employment to support herself, Mother never had enough to support Minor Children. Mother did not demonstrate satisfactory parenting skills because Mother often was unable to control her emotions enough to administer appropriate discipline. Minor Children are afraid of Mother, and Minor Children do not want to go back to Mother. Mother also did not demonstrate satisfactory parenting skills because Mother was not involved enough in helping with Minor Children's medical needs, Mother was not involved enough in Minor Children's education, and Mother was not asking about or helping Minor Children with general needs[.] Additionally, Mother did not demonstrate satisfactory parenting skills because her visits were often inappropriate, and because of her conduct, fluctuated between supervised and unsupervised visits. While Mother did undergo a mental health evaluation and provided it to the Agency on February 14, 2022, this was a goal from day one, and Minor Children were in placement for over 27 months by that point, which did not provide much time to implement its findings. Mother also completed a drug and alcohol evaluation, and the results of the test were negative. However, Mother never submitted to a drug test for a more specific drug, K2, when requested to do so recently….Mother did not follow all of the Agency's recommendations. Lastly, Mother was in arrears in her child support obligation…[Mother] had accrued an arrearage of $5,415.70 as of January 19, 2022. Again, the [Orphans'] Court

notes Mother's overall unsatisfactory conduct persisted over the whole history of the case for the 29 months from November 4, 2019, until the April 4, 2022, hearing.

Mother cannot or will not remedy her conduct[, which has caused Minor Children to be without essential parental care and control.]…Mother did not become emotionally invested enough to get to know Minor Children and their interests. Also, Minor Children have already been waiting in the legal and physical custody of the Agency for a lengthy 29 months by the April 4, 2022, hearing. Mother did not make sufficient progress regarding the Agency's overall main concerns for Mother when considering the totality of the record. Mother seems resistant to making improvements that the Agency recommends. Mother had the ability to improve the [living] situation…with tax return money from January of 2021[; however,] rather than securing appropriate housing with the money as recommended by the Agency, [she bought a car.] Additionally, Mother decided to bring gifts, clothing, and some food to every visit and to make birthdays and Christmas special for Minor Children rather than performing her goals and parental duties in the last six months so Mother has appeared more as a friend to Minor Children.

Furthermore, the services or assistance available to Mother are not likely to remedy the conditions which led to the removal or placement of Minor Children because Mother was informed about her goals, tasks, what she needed to do, and that the Agency had resources to assist her if she needed help. As some examples, the Agency offered to help with a mental health evaluation with Dr. Martha, the Agency gave Mother a food voucher, the Agency provided Mother with parenting education services, and the Agency helped Mother with finding appropriate housing, but Minor Children have remained in the custody of the Agency since November 4, 2019, because Mother failed to complete her goals.

Mother did not provide any credible explanation for her conduct or these conditions. While Mother had trouble affording housing, Mother did not follow all of the Agency's recommendations….Mother still [does] not have a good plan on how she would take care of Minor Children if granted custody again, and her excuses for resolving the issues that would arise were not credible. At the time of the April 4, 2022, hearing, Mother was not able to drive her car because she did not have a valid driver's license. Mother's plan to have Gary McGarvey drive her and Minor Children around when necessary was not viable

- 15 -

because Gary McGarvey needs a wheelchair, needs her care, and Minor Children are not his own children. Also, the [Orphans'] Court is concerned about this plan because Mother already has put Minor Children into her car without any car booster seats or proper restraints….Gary McGarvey testified he cannot really do anything by himself, and he would not be able to survive without Mother at this point in time….Finally, Mother would have difficulty taking care of Minor Children even during the daytime because Mother must sleep and take care of Gary McGarvey while she is home and not at work. Mother simply did not have a workable plan for taking care of Minor Children at the time of the April 4, 2022, hearing even though 29 months have passed.

\*\*\*

[The Orphans'] Court notes that Mother did make progress on some of her goals and that the Court considered her progress. Mother informed the Agency when there were changes in her living and job situations. Mother completed a parenting class in 2017, she completed another parenting class in September of 2020, and she started a new one recently. Mother did undergo a mental health evaluation and provided it to the Agency on February 14, 2022. However, this was a goal from day one, and Minor Children were in placement for over 27 months by that point which did not provide much time to implement its findings. Mother also completed a drug and alcohol evaluation, and the results of the test were negative. However, Mother never submitted to a drug test for a more specific drug, K2, when requested to do so….Mother let the Agency know of phone number and address changes, and Mother also signed all necessary releases of information as needed by the Agency. However, Mother did not make much progress on the goals that matter the most to the Agency and Minor Children, which included having a stable home, having stable employment, and demonstrating parenting skills. Minor Children remain afraid of Mother. Minor Children all want permanency, but Minor Children do not want to go back to Mother.

Orphans' Court Opinion, filed 6/2/22, at 18-22, 24.

We find no abuse of discretion or error of law. *In re T.S.M.*, *supra*. The record reflects Mother has continuously demonstrated an unwillingness to provide stable housing for Minor Children, maintain stable employment to

provide for Minor Children, and demonstrate proper parenting skills so that Minor Children are not afraid of her. Despite being given assistance by the Agency, Mother cannot or will not remedy these issues. *In re Adoption of M.E.P.*, *supra* The Agency proved by clear and convincing evidence that Mother's refusal has caused Minor Children to be without essential parental care, control, or subsistence necessary for their well-being. *See Id.*

Accordingly, we conclude the Orphans' Court did not abuse its discretion in ordering termination under Subsection 2511(a)(2). As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

As noted above, in order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a) before assessing the determination under Subsection 2511(b), and we, therefore, need not address any further Subsections of 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Subsection 2511(b). As to Subsection 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and

welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In *In re E.M*, [533 Pa. 115, 620 A.2d 481, 485 (1993)], th[e] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267 (quotation and citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Subsection 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the [orphans'] court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent….

- 18 -

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quotation marks and quotations omitted).

In determining that termination of Mother's parental rights favors Minor Children's needs and welfare under Subsection 2511(b), the Orphans' Court noted that, while Minor Children want permanency, they do not want to live with Mother. Orphans' Court Opinion, filed 6/2/22, at 23 (citation to record omitted). The Orphans' Court specifically found:

> Mother does not contribute positively towards the psychological health of Minor Children because Minor Children said that they are afraid of Mother who is mean and lies to them. Minor Children are anxious before and after visits with Mother, and Minor Children act differently on visitation days. Minor Children are all afraid before Mother's visits because they are worried Mother will hurt them, and they do not want to go back to live with her. N.M.M. and N.S.M. both make visits to the school nurse for headaches and stomachaches near visitation times with Mother. Minor Children have [pleaded] not to go to visits[.] Sometimes, Minor Children [have] tears streaming down their faces and their bodies shake when being told they needed to go to a visit. There are multiple recent incidents establishing that Minor Children are distressed by Mother.

*Id.* at 22 (citations to record omitted).

Moreover, in examining the bests interests of Minor Children under Section 2511(b), the Orphans' Court found:

> [W]hile Minor Children do have a bond with Mother, Mother has not enjoyed a consistent place of importance in Minor Children's lives, and the caseworker testified she believes Minor Children would adjust if the relationship is severed.
>
> ***
>
> The developmental, physical, and emotional needs, as well as the welfare, of Minor Children are all being addressed better by

Amanda Bressler. Minor Children have been doing amazing in foster placement for the last eight months and are well-adjusted away from Mother. Minor Children are improving academically. Minor Children are engaging in many extracurricular activities, they have friends, and A.S.M. "has come out of her shell." Minor Children are receiving appropriate medical care in foster placement and anything involving IEP is handled when needed. Amanda Bressler provides stability, is an adoptive resource, and Minor Children want to be adopted by her. Minor Children have a close relationship with Amanda Bressler. Minor Children go to her, hug her, sit on her lap, and they call [her] "Mom" and "Mommy."

*Id.* at 23-24 (citations to record omitted).

We conclude the Orphans' Court did not abuse its discretion in finding Minor Children's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to Subsection 2511(b). *See In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. The Agency presented ample evidence that Minor Children's daily needs were being met adequately by their foster mother, they seek comfort from her, and they refer to her as "Mom" or "Mommy."

To the extent Mother suggests the Orphans' Court did not adequately consider Mother's love for Minor Children and/or the bond between her and Minor Children, we disagree. The Orphans' Court considered in depth the issue of whether a bond existed and concluded "while Minor Children do have a bond with Mother, Mother has not enjoyed a consistent place of importance in Minor Children's lives, and the caseworker testified she believes that Minor Children would adjust if the relationship is severed." Orphans' Court Opinion, filed 6/2/22, at 23 (citation to record omitted).

We find no abuse of discretion or error of law. While Mother may profess to love Minor Children, a parent's own feelings of love and affection for her children, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Minor Children are entitled to permanency and stability. *See id.* "[A] parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude the Orphans' Court properly terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b) as to Minor Children. Thus, we affirm the Orphans' Court's April 4, 2022, termination orders.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/13/2022

- 21 -